**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Kennedy Decatrick KEMP, Appellant.**

Superior Court of Pennsylvania.

Submitted Sept. 6, 2007.

Filed Nov. 26, 2008.

Warner Mariani, Pittsburgh, for appellant.

Jerry L. Spangler, Assistant District Attorney, Somerset, for Commonwealth, appellee.

* Judge Todd did not participate in the consideration or decision of this case.

** Judge McCaffery did not participate in the consideration or decision of this case.

*** Judge Daniels did not participate in the consideration or decision of this case.

1. That subsection provides:

BEFORE: FORD ELLIOTT, P.J., MUSMANNO, ORIE MELVIN, LALLY-GREEN, TODD,* BOWES, GANTMAN, McCAFFERY ** and DANIELS,*** JJ.

OPINION BY BOWES, J.:

¶ 1 Kennedy Decatrick Kemp appeals from the July 25, 2006 judgment of sentence of six to twenty-three months imprisonment followed by two years probation that was imposed after he was convicted at a nonjury trial of possession of a controlled substance, possession of a controlled substance with intent to deliver, and conspiracy. Appellant challenges the constitutionality of the police interdiction that resulted in the seizure of the controlled substance, marijuana. We conclude that Appellant was subjected to a detention that was supported by the existence of reasonable suspicion that he was in possession of a controlled substance. We also conclude that the consent to search the vehicle in question was not constitutionally infirm. Hence, we affirm.

¶ 2 The facts adduced at the August 3, 2005 suppression hearing follow. In the early morning hours of March 19, 2005, State Trooper Anthony F. DeLuca was monitoring traffic along the Pennsylvania Turnpike near the Allegheny Tunnel. He observed Appellant's vehicle with tinted windows that prevented him from seeing inside the car, and he began to follow it. The windows were tinted on the front, front passenger's side, front driver's side, rear passenger's side, rear driver's side, and rear windows. Such tinting constituted a violation of 75 Pa.C.S. § 4524(e)(1).[1]

(e) SUN SCREENING AND OTHER MATERIALS PROHIBITED.—

(1) No person shall drive any motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle.

*Id.* at 9. When Trooper DeLuca stopped the car, Kandice Kyles was driving with Appellant sitting in the passenger seat.

¶ 3 The police officer testified, "The minute that [Kyles] rolled down her window, I got hit by an extremely strong odor of, [its] called masking agent, air fresheners, dryer sheets." *Id.* at 11. Trooper DeLuca stated that the odor indicated "there could be something in the vehicle." *Id.* When the trooper asked for documentation, Kyles did not respond and continually looked at Appellant. She appeared "very nervous" and her carotid artery was pulsating, another marker of extreme agitation. *Id.* at 12. Trooper DeLuca scanned the interior of the vehicle and observed "roughly 12 air fresheners" of various types, including a number of tree-shaped pine air fresheners, a crown air freshener, and an open jar of that substance. *Id.* at 13.

¶ 4 Kyles produced a New Jersey resident identification card, which appeared to be counterfeit, and Appellant produced a Florida driver's license. Appellant informed Trooper DeLuca that the vehicle was owned by a person whose last name was "Lee." During questioning, Appellant and Kyles were evasive and refused to look at the officer. Finally, while located at the driver's window of the vehicle, Trooper DeLuca could "detect the faint odor of marijuana, raw marijuana ... from the inside of the vehicle outward." *Id.* at 27. Trooper DeLuca detailed the nature of the narcotic scent:

Narcotics, when sitting in a vehicle for a long time, [they] begin to basically what they call burn into the vehicle. If it's locked inside the vehicle, if it's hot out, they have an air, air conditioner on, if they have the heating system on, and there's a narcotic located inside the vehicle, if it's a large amount of narcotics, it's going to bake in a vehicle, bake into

their clothing, bake into the seats. And I was getting a faint odor of raw marijuana coming from inside the vehicle. *Id.* at 28.

¶ 5 Trooper DeLuca delineated his extensive training in detecting drug trafficking as well as vast experience in such investigations and was qualified to testify as an expert witness. *Id.* at 15–16, 26. From this training and experience, he knew that drug traffickers often attempt to mask the scent of marijuana with a large number of air fresheners and use third-party vehicles rather than their own vehicles to transport drugs so that they will not lose personal property if the vehicle is seized.

¶ 6 Specifically, Trooper DeLuca testified that he was trained in drug courier detection techniques, and looked for the following indicia of such activity: 1) either third-party ownership of vehicles or third-party rentals, where the third party is not present in the car; 2) the "presence of masking agents such as crown air freshener" or what police refer to as "felony forests where the people just throw a bunch of those Christmas trees in their vehicle to try to get rid of an odor;" 3) whether the car is coming from a source city, such as New York, Allentown, Lancaster, Reading, Philadelphia, Pittsburgh, or Harrisburg; 4) nervous reactions by the car's occupants, including sweatiness, refusal to make eye contact, hand wringing, a pulsating carotid artery, and the inability to give clarifying answers to questions; and 5) the presence of counterfeit documents. *Id.* at 21. The trooper also stated that people who are not attempting to mask the scent of a controlled substance normally would have one or two air fresheners.

¶ 7 The officer returned to his car and conducted a check of Kyles and the car. Kyles was not a licensed driver, and the car was not owned by a person whose last

name was Lee but by Lanika Paolucci. *Id.* at 29. After Trooper DeLuca issued a warning for the improperly-tinted windows and the license violation, he asked Kyles to exit the car, showed her the warnings, explained that Appellant would have to drive, and told her "to have a nice day." *Id.* at 34. When Kyles started to walk away, Trooper DeLuca re-initiated contact by asking if he "could speak to her a minute." *Id.* at 35.

¶ 8 Kyles agreed, and in response to his question about the location of her origin and destination, stated that she was traveling from Allentown to Pittsburgh. She was asked a number of details about why she went to Allentown and what she did while there. Trooper DeLuca told Kyles that she was free to go and instructed her to tell Appellant, who was standing outside the vehicle, that he would have to drive.

¶ 9 When Appellant returned to the vehicle, Trooper DeLuca gave Appellant his driver's license, shook his hand, and told him "to have a nice day." *Id.* at 37. As Appellant reached the driver's side door, Trooper DeLuca re-initiated contact with him by asking "if [he] could speak to him for a minute." *Id.* Appellant walked back toward Trooper DeLuca. Trooper DeLuca questioned Appellant about details of his travel and then asked Appellant if there were any "guns, drugs, or money" inside the vehicle. *Id.* at 40. Appellant immediately broke eye contact with the officer and responded negatively. Then, Trooper DeLuca asked Appellant if he "could look inside the vehicle, and [Appellant] stated: Sure, I'll pop the trunk." *Id.* at 41. Trooper DeLuca immediately saw a plastic bag. He "grabbed the bag, and [his] plain feel of the bag" made him realize that "the bag was full of marijuana."

*Id.* At that point, Appellant was arrested. Another officer at the scene arrested Kyles.[2]

¶ 10 Based on this evidence, the suppression court refused to suppress the fruits of the vehicular search. On May 15, 2006, the case proceeded to a nonjury trial where the Commonwealth established that there were nearly twenty-three pounds of marijuana in the car. On May 16, 2006, Appellant was found guilty of possession of a controlled substance, possession of a controlled substance with intent to deliver, and conspiracy. On July 25, 2006, he was sentenced to six to twenty-three months imprisonment followed by two years probation. This appeal followed.

 ¶ 11 Appellant raises this contention for our review:

The lower court erred in denying Appellant's suppression motion because, even though the initial traffic stop in this case may have been proper, the prolonged seizure after the Sergeant had achieved the purpose of the vehicle stop required reasonable suspicion to support the continuation of the stop and questioning of Appellant.

Appellant's brief at i.

 ¶ 12 Initially, we outline our standard of review:

When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. *Commonwealth v. Davis,* 491 Pa. 363, 421 A.2d 179 (1980).... Where the record supports the factual

---

**2.** While the record is unclear, the suppression court noted that the second officer arrived on the scene later.

findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831, 842 (2003). However, where the appeal of the determination of the suppression court turns on allegations of legal error, "the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts." *Commonwealth v. Nester,* 551 Pa. 157, 709 A.2d 879, 881 (1998).

*Commonwealth v. Mistler,* 590 Pa. 390, 912 A.2d 1265, 1269–70 (2006).

¶ 13 In the present case, the suppression court concluded that the traffic stop became a mere encounter once Trooper DeLuca returned the documents to Appellant and told him to have a nice day. The court held that Appellant's consent to search was not procured as the result of a detention. However, we cannot agree with that assessment of the situation.

¶ 14 In *Commonwealth v. Strickler,* 563 Pa. 47, 757 A.2d 884 (2000), our Supreme Court analyzed under what circumstances a police interdiction can devolve into a mere encounter following a traffic stop when police continue to question the person after the reason for the traffic stop has concluded. The Supreme Court in *Strickler* ruled that after police finish processing a traffic infraction, the determination of whether a continuing interdiction constitutes a mere encounter or a constitutional seizure centers upon whether an individual would objectively believe that he was free to end the encounter and refuse a request to answer questions.

¶ 15 Our Supreme Court adopted a totality-of-the-circumstances approach. It delineated a non-exclusive list of factors to be used in making this assessment. Those

factors include 1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location and time of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including its degree of coerciveness; 8) "the degree to which the transition between the traffic stop/investigative detention and the subsequent encounter can be viewed as seamless, ... thus suggesting to a citizen that his movements may remain subject to police restraint," *id.* at 898; and 9) whether there was an express admonition to the effect that the citizen-subject is free to depart, which "is a potent, objective factor." *Id.* at 899. Our Supreme Court also observed that when an individual has been subjected to a valid detention but police continue to engage the person in conversation, the person is less likely to reasonably believe that he is actually free to leave the scene.

¶ 16 Herein, both Appellant and his companion were stopped at 1:30 a.m. Two police vehicles were present at the scene. Appellant and Kyles were directed to stand outside their vehicle. Immediately before he approached Appellant, Trooper DeLuca told Kyles that she was free to leave. Kyles, however, was physically incapable of leaving the scene because she was not permitted to drive and had also been directed to tell Appellant to report to the Trooper. Immediately after telling Kyles that she could leave, Trooper DeLuca re-initiated contact with her and subjected Kyles to extensive interrogation about the details of her travel, including who she was visiting in Allentown and why.

¶ 17 After returning Appellant's documents, Trooper DeLuca never expressly

informed Appellant that he was free to leave the scene and instead, Trooper De-Luca then immediately re-initiated contact with Appellant in a seamless interdiction. Appellant was still standing outside his vehicle. As we noted in *Commonwealth v. Moyer*, 2008 PA Super 173, ¶ 34, 954 A.2d 659, when a person is standing outside rather than inside his vehicle, he is less likely to believe that he can actually leave the area by entering the car and driving away.

¶ 18 Also significant to our determination is the fact that Trooper DeLuca had observed major indicia of drug-related activity during the course of the traffic stop. It is unlikely that after returning the documents and telling Appellant to have a nice day, Trooper DeLuca would have permitted Appellant to enter the car and drive away. Thus, given the totality of the circumstances at issue, we conclude that Appellant was, in fact, not free to leave after Trooper DeLuca returned his driver's license. Rather, Appellant was subjected to an investigatory detention.

 ¶ 19 However, we also conclude that the facts adduced by Trooper DeLuca during the course of the valid traffic stop clearly and unequivocally gave him reason to suspect that Appellant and Kyles were in possession of a controlled substance, and thus, there were sufficient facts to justify the investigatory detention.[3] When the trooper first approached the car's open window, he was overpowered by the scent of air fresheners. He observed a sufficient number of air fresheners in the vehicle to reach a conclusion, based on his extensive training and experience in drug trafficking interdictions, that the air fresheners were being utilized as a masking agent to ob-

scure the odor of drugs. The trooper also noticed that Kyles was extremely nervous. He ascertained that Kyles and Appellant were operating a third-party vehicle, another marker of a drug courier, and Appellant failed to provide the name of its real owner. Finally, the trooper detected an odor of raw marijuana and was aware from his training and experience that the source of that smell emanated from a significant amount of the drug. These facts were sufficient to provide reasonable suspicion to support an investigatory detention of Kyles and Appellant, and Trooper DeLuca's continued questioning of them despite the fact that the reason for the traffic stop had ostensibly been concluded was not constitutionality infirm. We begin our analysis by examining *Commonwealth v. Rogers*, 578 Pa. 127, 849 A.2d 1185 (2004).

¶ 20 In *Rogers*, the defendant had been seized by a state trooper pursuant to a valid traffic stop. During the officer's processing of the stop, the defendant's extreme nervousness was evidenced by visible trembling. Although the defendant produced paperwork documenting the ownership of the car, it was incomplete and contained information that the defendant admitted to be false. The defendant informed the officer that he just had visited a friend, but could not provide that friend's name. The officer also observed open boxes of laundry detergent and fabric softener that, based on his experience, were serving as masking agents. A criminal history search revealed that the defendant had a prior drug conviction.

¶ 21 The defendant was asked to exit his car and to permit a search of it, but the defendant refused. Two canine searches were conducted, and the dogs twice alerted

---

**3.** As noted, the suppression court concluded that Kyles and Appellant had not been subjected to an investigatory detention. However, it is established that we can affirm the trial

court on any valid basis. *Plasticert, Inc. v. Westfield Ins. Co.*, 923 A.2d 489 (Pa.Super.2007).

for the presence of a controlled substance. A search conducted pursuant to a warrant revealed the presence of fifty-two pounds of marijuana in the vehicle.

¶ 22 The Supreme Court first addressed the issue of whether the officer "had reasonable suspicion to detain [the defendant] beyond the initial traffic stop." *Id.* at 1189. It outlined the pertinent law:

A police officer may detain an individual in order to conduct an investigation if that officer reasonably suspects that the individual is engaging in criminal conduct. *Commonwealth v. Cook*, 558 Pa. 50, 735 A.2d 673, 676 (1999). "This standard, less stringent than probable cause, is commonly known as reasonable suspicion." *Id.* In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. *In re D.M.*, 566 Pa. 445, 781 A.2d 1161, 1163 (2001). In making this determination, we must give "due weight ... to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience." *Cook*, 735 A.2d at 676 (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, "even a combination of innocent facts, when taken together, may warrant further investigation by the police officer." *Cook*, 735 A.2d at 676.

*Id.*

¶ 23 The Court concluded that reasonable suspicion existed to suspect the defendant of criminal activity because he displayed extreme nervousness, was unable to provide a response as to his friend's name, produced incomplete and false documents regarding ownership of the car, and was operating a car containing masking agents.

¶ 24 In the present case, Trooper DeLuca not only observed two indicia of a drug courier, the presence of a masking agent and third-party vehicle ownership, he detected an odor of fresh marijuana indicating that a significant amount of that substance was present. Furthermore, Kyles displayed extreme nervousness, Appellant did not provide the correct name of the car's owner, and they were traveling from a source city. Thus, Trooper DeLuca had more facts at his disposal to establish reasonable suspicion than did the officer in *Rogers*.

¶ 25 This case is clearly distinguishable from that upon which Appellant relies, *Commonwealth v. Dales*, 820 A.2d 807 (Pa.Super.2003). In *Dales*, we concluded that police did not have reasonable suspicion to continue a detention beyond a traffic stop. Therein, the officer merely observed three or more air fresheners in a car, as well as an aroma that the officer was "not able to definitively relate" to a controlled substance. *Id.* at 810. In this case, Trooper DeLuca indicated unequivocally that the odor was that of fresh marijuana.

¶ 26 Appellant next alleges that once Trooper DeLuca told Kyles and Appellant that they were free to leave, any facts garnered during the course of the valid vehicular stop could not be used to justify the continued detention. In this respect, Appellant relies upon our panel decision in *Commonwealth v. Ortiz*, 786 A.2d 261 (Pa.Super.2001). While *Ortiz* does stand for the proposition advanced by Appellant, we conclude that it was wrongly decided.

¶ 27 The following facts informed the *Ortiz* decision. The defendant's vehicle was stopped for an illegally-tinted window, and he gave the police officer a driver's license and documents indicating that the car was owned by a third party. Despite

police instructions to do so, the defendant refused to stay in the car and displayed extreme anxiety. While the officer was processing the vehicular violation, he discovered that the defendant had permission from the owner of the vehicle to drive it, but that the defendant's driver's license had been suspended for driving under the influence. After issuing a warning and returning the defendant's paperwork, the officer informed the defendant that he was free to leave but that he could not drive the vehicle.

¶ 28 As the defendant was retrieving his belongings, the officer asked the defendant if he had anything illegal in the car, and the defendant responded in the negative. Police then asked to search the car, the defendant consented, and drugs were discovered.

¶ 29 We held that the traffic stop concluded when the officer returned the defendant's paperwork and told him that he was free to leave. We then held that a second detention was initiated when the officer started questioning after giving the impression that the defendant could leave. We concluded that the second detention was not supported by reasonable suspicion and stated, "While [the defendant's] behavior during the initial investigative detention may have merited further inquiry to determine if his anxiety was due to illegal conduct, nothing happened **after** the conclusion of the initial stop to give [police] further cause for suspicion." *Id.* at 266 (emphasis in original). Since the defendant's consent to search the car had been obtained through an unconstitutional detention, we suppressed the drugs discovered in the car.

¶ 30 The quoted language implies that once an officer confers the "free-to-go language," he may not rely upon facts ascertained prior to conferral of that verbiage to establish reasonable suspicion. This construction was assigned to *Ortiz* in *Commonwealth v. Johnson*, 833 A.2d 755 (Pa.Super.2003). In *Johnson*, a driver was stopped for speeding. The defendant was a passenger in the car. Once stopped, the driver immediately exited the car, approached the police officer, and insisted that he needed to urinate. After conducting a patdown search and feeling a large wad of cash, which the driver admitted was about $2,300, the officer allowed the driver to relieve himself and return to the car. The officer then observed rolling papers consistent with those used by drug users as well as tobacco spread around the interior of the car. The officer processed the speeding violation, returned the driver's documentation, and informed the driver he was free to go. Before the driver could leave, the officer reinitiated questioning. During the ensuing interdiction, the officer gathered sufficient facts to support a belief that the occupants of the car had illegal drugs, which were discovered in the defendant's possession.

¶ 31 On appeal, we first concluded that the police officer engaged in a custodial detention when he re-initiated contact after completion of the traffic stop. We then applied *Ortiz* and analyzed the holding as follows:

> Where, as here, the detention at issue follows a prior valid traffic stop, an arresting officer must demonstrate cause for suspicion **after** the end of the initial stop independent of any basis on which he conducted that stop. *See Ortiz*, 786 A.2d at 266 ("Without existence of a reasonable suspicion after the first encounter had ended, the second detention was unlawful"). Thus, in *Ortiz*, we recognized that even where a defendant's conduct during the initial stop "may have merited further inquiry," the arresting officer's instruction to the defendant that he was free to leave vitiated

any grounds he had to hold the defendant further. *See id.,* 786 A.2d at 266. Absent some new observation of suspicious circumstances, the defendant's continued detention was illegal.

*Id.* at 763.

¶ 32 Thus, under *Ortiz* and *Johnson,* the current law in Pennsylvania provides that once a police officer informs a defendant that he is free to leave after completing a valid traffic stop, any facts ascertained during that initial traffic stop are nullified and may not be utilized to support a continued detention, even if the facts discovered during the processing of the traffic stop support the existence of reasonable suspicion that the defendant is engaging in illegal activity. We now proceed to analyze the propriety of that legal construct. In support of this concept, both *Ortiz* and *Johnson* relied upon *Commonwealth v. Freeman,* 563 Pa. 82, 757 A.2d 903 (2000). However, *Freeman* does not hold that facts garnered during a constitutionally-proper traffic stop cannot be utilized in assessing whether reasonable suspicion exists for a detention that continues after the reason for the traffic stop has been resolved.

¶ 33 In *Freeman,* the state police noticed two vehicles on an interstate highway traveling together in a dangerous fashion. Each vehicle was stopped by a separate cruiser. One trooper asked Freeman, the driver, about her driving behavior, and she denied traveling with the other car. The trooper requested Freeman's documentation and initiated a check. He was radioed by the second trooper who had stopped the other vehicle and was informed that the driver of the other car contradicted Freeman and indicated that he was traveling with her.

¶ 34 The first trooper re-approached Freeman's car, gave her a warning for a vehicular infraction, returned her documents, and stated that she was free to leave. The trooper walked away. When Freeman did not drive away, the trooper returned to her vehicle and asked her again whether she was traveling with the other car. After she repeated her negative response, the trooper indicated that the occupants of the other vehicle had contradicted that information. He ordered her from her car and asked to search it. Freeman gave permission, and contraband was discovered. Our Supreme Court suppressed the fruits of that search, concluding that police had initiated a seizure when they re-approached Freeman's car and ordered her to exit it. The Court concluded that the detention was not supported by reasonable suspicion.

¶ 35 In *Ortiz,* we referenced page 908 of *Freeman* in support of our position that a second detention initiated after a traffic stop has ended must be supported by facts gathered after the conclusion of the traffic stop. That particular reference to *Freeman* states as follows:

Since we have concluded that Freeman was seized at the time her consent was obtained, we must determine whether such seizure was lawful. To constitute a valid investigative detention, the seizure must be justified by an articulable, reasonable suspicion that Freeman may have been engaged in criminal activity independent of that supporting her initial lawful detention. . . . In the present case, however, there are no facts of record indicating that the trooper did possess, or could have possessed, a reasonable suspicion of criminal activity on Freeman's part.

While the trooper undoubtedly suspected that Freeman wished to conceal the fact that she was traveling with the other vehicle, such suspicion had been present when he gave Freeman a warning and told her that she was free to go.

Nothing had happened after the conclusion of the traffic stop to provide any further cause for suspicion; at most, Freeman's apparent reluctance to drive away may have strengthened the trooper's initial suspicion that the two vehicles were traveling together.

*Freeman, supra* at 908.

¶ 36 The Supreme Court conceded that Freeman's answers constituted evasive behavior but held that evasiveness, standing alone, did not provide the police with enough facts to establish reasonable suspicion that she was engaged in criminal activity.

¶ 37 We do not believe that *Freeman's* language supports *Ortiz's* proposition. The Supreme Court in *Freeman* quite plainly stated that in order to justify a continued detention beyond the initial valid detention, which was the traffic stop, police needed reasonable suspicion that the defendant was engaged in criminal activity independent of that initial lawful detention. In other words, once police process the traffic violation, they cannot rely upon the traffic violation to prolong the detention; they need other information supporting reasonable suspicion.

¶ 38 In *Freeman,* no facts were ascertained during the traffic stop or thereafter to provide reasonable suspicion that the defendant was involved in criminal activity. The Court did not imply that anything discovered during the course of a traffic stop could not be utilized to justify an ensuing investigatory detention. Indeed, the Court actually analyzed what police were told during the traffic stop, which would imply, contrary to the holding in *Ortiz,* that those facts **can** be considered in determining whether reasonable suspicion existed for an investigatory detention initiated after a vehicular violation has been processed.

¶ 39 We conclude that *Ortiz's* decision is improper for two distinct reasons. First, it is simply analytically inconsistent for a defendant to argue that "free-to-go" language does not step down the police interdiction from a seizure to a mere encounter, but that if an officer does utter those words, all facts ascertained lawfully by the police officer during the traffic stop are erased for purposes of analyzing whether the continued detention was permissible. If the seizure achieved through the traffic stop never ended, and if thereby the defendant remained subject to a continuing detention when the traffic infraction was processed, then there is no reason why the facts observed by the officer during the constitutionally-proper traffic stop cannot be used to justify the continuation of the detention. If it is a continuing detention for the defendant, despite the free-to-go language, then by the same logic, it is a continuing detention for purposes of the police investigation.

 ¶ 40 Additionally, we believe that the approach adopted by *Ortiz* conflicts with appropriate constitutional analysis. "When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); *accord Rogers, supra; Freeman, supra.* A totality-of-the-circumstances approach allows the court to consider all facts at the officer's disposal and does not require the court to disregard those adduced during a valid interdiction, which is, in the present case, the traffic stop. Indeed, routine constitutional analysis requires courts to utilize facts gathered during each escalating phase of a

police investigation in determining whether police acted properly as the interaction between police and citizen proceeded towards an arrest.

¶ 41 Three federal circuit courts of appeal have considered this precise question. In *United States v. Williams*, 271 F.3d 1262 (10th Cir.2001), a police officer stopped a car for a moving violation, and during the course of processing the violation, he made several observations that led him to conclude that the defendant was transporting drugs. Even though his suspicions had been aroused, the officer returned the defendant's vehicular documents and suggested that he could leave the scene by stating, "Thanks a lot. We'll see you." *Id.* at 1265. The officer then re-initiated contact with the defendant by asking him if he minded answering some questions. Eventually, drugs were discovered during a vehicular search.

¶ 42 The defendant in *Williams* argued that once the officer indicated that the defendant could leave the area, that "act on the part of the officer nullified any of the suspicion that developed throughout the [vehicular] stop." *Id.* at 1271. The court of appeals disagreed. It noted that the defendant had referenced no case law, nor had the court uncovered any that implied that a return of documentation "negates an officer's objectively reasonable suspicions developed during a traffic stop." *Id.* at 1271. The court of appeals concluded that the police officer's "indication to [the defendant] that he was free to leave bears no significance in our determination of whether the [police] had reasonable suspicion to detain [the defendant]." *Id.*

¶ 43 Next, the Fourth Circuit Court of Appeals considered the issue in *United States v. Foreman*, 369 F.3d 776 (4th Cir. 2004). In that case, the police officer observed two traffic violations, excessive speed and obstruction of the rear window

by several air fresheners. The defendant, who was driving, also appeared tense. Once stopped, the defendant displayed extreme nervousness, including a pulsating carotid artery, and he had currency in the vehicle. The defendant was ordered to wait in the police vehicle while the traffic violations were being handled. In the meantime, other officers arrived with a canine capable of detecting the presence of narcotics. The defendant's documents were returned and a verbal warning was issued for the two violations. The defendant agreed to remove the air fresheners and exited the patrol car. After the defendant exited the cruiser, the police officer started to ask further questions and eventually asked to search the car. The defendant would not agree, the dog was then employed to check the exterior of the car, and the dog alerted. The car was searched, and cocaine and cash were discovered.

¶ 44 The district court suppressed the drug evidence, concluding that "once the lawful seizure occasioned by the traffic stop ended, Foreman was seized a second time." *Id.* at 782. In analyzing the propriety of the second seizure, the district court opined that neither the police nor the court could "rely on any factors tending to show reasonable suspicion that occurred prior to the termination of the traffic stop[.]" *Id.* Since no indicia of suspicion occurred after the traffic stop ended, the district court concluded that the second seizure violated the Fourth Amendment.

¶ 45 On appeal, the Fourth Circuit Court of Appeals addressed "whether it was appropriate for the district court, in determining whether there was reasonable suspicion for the drug dog sniff, to ignore all of the events which occurred before the time [the police] returned Foreman's paperwork and allowed him to exit his patrol car, *i.e.*, ostensibly allowing Foreman to

leave." *Id.* The circuit court noted that the district court had not cited any "case law supporting the proposition that it was required to ignore all the events which occurred before the time [the police officer] ostensibly allowed Foreman to leave. We are aware of none." *Id.* The court of appeals then adopted the reasoning of the *Williams* Court, indicating that *Williams* was "persuasive." *Id.* at 784. It held that the district court should have examined all of the circumstances surrounding Foreman's encounter with police in determining whether there was reasonable suspicion.

¶ 46 In the most recent case, *United States v. Fuse*, 391 F.3d 924 (8th Cir.2004), police initiated a proper traffic stop, and after the traffic stop was processed, told the defendant to have a "safe trip." *Id.* at 926. When the defendant started to place his car in gear, the officer then asked if the defendant would answer some questions. The driver assented, and a vehicular search, resulting in the seizure of drugs, eventually was conducted.

¶ 47 On appeal, the Eighth Circuit Court of Appeals entertained the "question of whether an officer's objectively reasonable suspicions developed during a traffic stop are nullified when the officer indicates to a driver he is free to leave." *Id.* The circuit court answered that question in the negative and held that "the termination of a traffic stop does not effectively erase the objectively reasonable suspicions developed by a police officer during the traffic stop." *Id.* at 929. Once again, the court of appeals relied upon the reasoning of *Williams*. *See also United States v. Sanchez*, 408 F.Supp.2d 1255 (S.D.Fla.2005).

¶ 48 Thus, the *Ortiz* position has not been accepted in the federal system. It is also not supported by the reasoning of *Freeman*. We are required to apply a "totality of the circumstances" test in assessing whether police had reasonable sus-

picion to conduct an investigatory detention. Therefore, we overrule *Ortiz* and *Johnson* to the extent that they hold that facts gathered during a valid traffic stop cannot be utilized to justify an investigatory detention occurring after a police officer has indicated that a defendant is free to leave. *Commonwealth v. Jacobs*, 900 A.2d 368, 377 n. 9 (Pa.Super.2006) (Superior Court, sitting *en banc*, can overrule panel decision by three judges).

¶ 49 In this case, Trooper DeLuca had sufficient facts at his disposal to support a reasonable suspicion that Appellant was in possession of narcotics, and the investigatory detention occurring after the conclusion of the traffic stop was constitutional. Therefore, we now must proceed to analyze the voluntariness of Appellant's consent to search the vehicle. *See Commonwealth v. Reid*, 571 Pa. 1, 811 A.2d 530, 545 (2002) ("If the court finds that … a lawful interaction preceded an alleged consent, the court must then determine whether the prosecution has adequately proven that the consent was made voluntarily and was not the product of duress or coercion.").

A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). One such exception is consent, voluntarily given. *See id.* at 219, 93 S.Ct. at 2043–44. The central Fourth Amendment inquiries in consent cases entail assessment of the constitutional validity of the citizen/police encounter giving rise to the consent; and, ultimately, the voluntariness of consent. *See id.; see also Commonwealth v. Cleckley*, 558 Pa. 517, 528, 738 A.2d 427, 433 (1999). Where the underlying encounter is

found to be lawful, voluntariness becomes the exclusive focus.

*Commonwealth v. Strickler, supra* at 888–89 (footnote omitted).

In connection with [the inquiry into the voluntariness of a consent given pursuant to a lawful encounter], the Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances.... [W]hile knowledge of the right to refuse to consent to the search is a factor to be taken into account, the Commonwealth is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.... Additionally, although the inquiry is an objective one, the maturity, sophistication and mental or emotional state of the defendant (including age, intelligence and capacity to exercise free will), are to be taken into account....

Since both the tests for voluntariness and for a seizure centrally entail an examination of the objective circumstances surrounding the police/citizen encounter to determine whether there was a show of authority that would impact upon a reasonable citizen-subject's perspective, there is a substantial, necessary overlap in the analyses.

*Id.* at 901–02.

¶ 50 As noted, the *Strickler* Court promulgated a non-exclusive list of factors to be employed in determining whether a seizure occurred for purposes of the Constitution. We conclude that the following factors outlined therein are pertinent to a determination of whether consent to search is voluntarily given: 1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including its degree of coerciveness; 8) whether the person has been told that he is free to leave; and 9) whether the citizen has been informed that he is not required to consent to the search. *Id.* at 898–99.

¶ 51 Herein, there was no excessive police conduct. No physical contact occurred between police and the two citizens, and the officer did not display his weapon. While Trooper DeLuca did order Kyles to exit the car, this directive was not excessive because it was necessitated by the fact that Kyles was not a licensed driver and had to move out of the driver's seat. There is no indication that Trooper DeLuca acted aggressively. The interdiction was along a highway. Appellant does not argue that he lacked maturity or sophistication or was intellectually incapable of exercising free will.

¶ 52 Moreover, the character of the initial investigative detention, the traffic stop, was routine and the ensuing investigatory detention was supported by reasonable suspicion. We therefore conclude that Appellant's permission was not the product of duress or coercion, but in fact was voluntarily given even though Appellant was not informed that he could refuse to consent to the search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (defendant need not be informed that he has the right to refuse consent to search in order to render consent constitutionally valid; totality of circumstances are examined in determining whether consent was voluntarily given or was product of coercion); *Commonwealth v. Cleckley*, 558 Pa. 517, 738 A.2d 427 (1999) (same).

¶ 53 Judgment of sentence affirmed.

¶ 54 Judge ORIE MELVIN files a Concurring Statement.

¶ 55 Judge GANTMAN Concurs in the Result.

CONCURRING STATEMENT BY ORIE MELVIN, J.:

¶ 1 While I agree with the majority's affirmance of the trial court's refusal to suppress the evidence, I write separately to clarify that I do so on the basis that I believe the latter portion of the interaction between Appellant and Trooper DeLuca was a mere encounter and not an investigative detention. In all other respects, I agree with the majority's cogent analysis.