J-S37029-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| EDGAR PINEDA-PITA | |
| Appellant | No. 1333 MDA 2016 |

Appeal from the Judgment of Sentence July 26, 2016
In the Court of Common Pleas of Centre County
Criminal Division at No(s): CP-14-CR-0000212-2015

BEFORE:  STABILE, J., MOULTON, J., and MUSMANNO, J.

MEMORANDUM BY MOULTON, J.:                **FILED NOVEMBER 20, 2017**

Edgar Pineda-Pita appeals from the July 26, 2016 judgment of sentence entered in the Centre County Court of Common Pleas following his convictions for possession with intent to deliver ("PWID"), possession of a controlled substance, and possession of drug paraphernalia.[1]  We affirm.

The trial court set forth the following facts:

> 1. At approximately 11:13 a.m. on January 23, 2015, Corporal Reed Grenci was doing drug interdiction work on Interstate 80 near mile marker 151, at which time he observed a white Ford Explorer traveling east with what he descri[b]ed as having heavily tinted, aftermarket sun screening material.
>
> 2. Corporal Grenci initiated a traffic stop on the Ford Explorer near mile marker 154 eastbound.

---

[1] 35 P.S. § 780-113(a)(30), (a)(16), and (a)(32), respectively.

3. Corporal Grenci approached the passenger side of the vehicle and made contact with the occupants, at which time he requested identification from the driver and each of the passengers.

4. The driver was identified as Frank Garcia by his Florida identification card. The front passenger, Edgar Pineda-Pita, was identified through his Michigan license as the owner of the vehicle, and the rear seat passenger, who was asleep at the time of the stop, was identified as Diego Contreras through his Michigan license.

5. Corporal Grenci identified Michigan and Florida as common source areas for drugs, specifically Michigan because it is a medical marijuana state, and the combination was suspicious based on his training and experience.

6. Corporal Grenci testified that upon interaction with the occupants of the vehicle, they were overly friendly, often an indicator of suspicious activity.

7. After obtaining identification, Corporal Grenci returned to his patrol vehicle and ran a criminal record check on the driver, Frank J. Garcia, at which time it was discovered that Mr. Garcia had an active warrant in Pennsylvania for felony drug trafficking violations.

8. Corporal Grenci called for backup and several other members of the Pennsylvania State Police arrived at the scene.

9. About twenty to thirty minutes later, Corporal Grenci then removed Mr. Garcia from the vehicle and took him into custody pursuant to the outstanding warrant.

10. At this time, Mr. Pineda-Pita got out of the vehicle and walked back toward the police car. Trooper Jeremy Hoy ordered him to get back inside the vehicle.

11. After securing Mr. Garcia, Corporal Grenci asked Mr. Pineda-Pita to exit the vehicle. The Corporal explained to him what was going on with Mr. Garcia and why [Mr. Garcia] was taken into custody.

12. Corporal Grenci then asked about Mr. Pineda-Pita's travel plans. Mr. Pineda-Pita paused with an "uhhhh," and

seemed unsure but stated the group was heading to Union City, New Jersey for Mr. Contrera[s'] cousin's wedding.

13. Corporal Grenci then asked Mr. Pineda-Pita if he could search the vehicle. Mr. Pineda-Pita again responded with "uhhhh," and in what the Trooper described as a deflated tone asked "Really?"

14. Mr. Pineda-Pita continued to stall the conversation and then looked under the rear of the vehicle where the spare tire is located and uttered the word "shit." This stood out to the Corporal as an indicator of criminal activity and that Mr. Pineda-Pita knew exactly what was located under the vehicle.

15. Mr. Pineda-Pita then asked the Corporal how long the search would take. Corporal Grenci told him the search could happen right now, it wouldn't take very long, and if everything was fine they could follow him back to the station.

16. At this point, Mr. Pineda-Pita stated, "Go ahead." Corporal Grenci clarified and asked "Are you sure?" Mr. Pineda-Pita said "Yeah." Corporal Grenci clarified again, "That's a yes?" Mr. Pineda-Pita responded "Yeah."

17. At no time did Corporal Grenci display his badge, draw his weapon, or use any sign of force or aggression.

18. Corporal Grenci then went to the driver's side rear door to get Mr. Contreras out of the vehicle before starting his search.

19. Upon opening the door, Corporal Grenci immediately smelled a very strong odor of fresh marijuana coming from the vehicle, as well as on Mr. Contreras as he was patting him down.

20. Corporal Grenci then searched the vehicle. Before conducting an interior search, however, the Corporal started with the spare tire because of Mr. Pineda-Pita's previous actions.

21. Corporal Grenci crawled under the vehicle and looked up at the spare tire. In plain view through the holes in the wheel well he could see black garbage bags wrapped in gray duct tape.

22. Corporal Grenci was immediately suspicious of the materials, recognizing it as consistent with illegal drug packaging he has seen in the past.

23. At this point, Mr. Pineda-Pita and Mr. Contreras were taken into custody and Corporal Grenci had the vehicle towed to PSP Rockview for the search to be conducted off the highway for safety reasons.

24. The vehicle was searched almost immediately after getting to the station. Under the spare tire, troopers found four pounds of marijuana inside the black garbage bags.

25. Upon further search of the vehicle, another four pounds of marijuana w[ere] found in a speaker box in the rear cargo area, and another three pounds of marijuana laying on the floor behind the middle row seat and under the folded down third row seat.

26. Also during the search of the vehicle, Corporal Grenci notice[d] multiple air fresheners laying on the dashboard close to the windshield where the defrost air vents are located. In addition, the sun roof was open despite it being January and extremely cold outside.

27. The black packaging material was then sent out for testing. Fingerprint testing confirmed one of Mr. Pineda-Pita's thumbprints was found on one of the packages of marijuana.

Trial Ct. Op., 9/18/15, at 1-5.

On March 27, 2015, Pineda-Pita filed an omnibus pre-trial motion, which included a motion to suppress. Following a hearing, the trial court denied Pineda-Pita's motion to suppress on September 18, 2015. On May 9, 2016, following a jury trial, Pineda-Pita was convicted of the aforementioned offenses. On July 26, 2016, the trial court sentenced him to 90 days to 23½ months' incarceration and a consecutive 1 year of probation. Pineda-Pita did

not file a post-sentence motion and, on August 10, 2017, filed a timely notice of appeal.

Pineda-Pita raises the following issues on appeal:

I.      Whether the trial court erred in denying [Pineda-Pita]'s motion to suppress when the search and seizure at the heart of the matter occurred in the absence of a search warrant and without legally sufficient basis.

II.     Whether the trial court erred in concluding that [Pineda-Pita] gave voluntary consent to search his vehicle when said consent was not unequivocal and purportedly was offered in the midst of an unlawful seizure, during which [Pineda-Pita] was not advised that he was free to leave or that he could withhold consent.

III.    Whether the trial court erred in extending the holding of **Commonwealth v. Gary**, 91 A.3d 102 (Pa. 2014)[,] to a situation involving the immobilization of a vehicle without knowledge of any contraband, the towing of said vehicle to police barracks, and a warrantless search and seizure of said vehicle and its contents at the barracks.

Pineda-Pita's Br. at 4 (full capitalization omitted).

In reviewing the denial of a suppression motion, we must determine:

whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on

an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010) (internal quotations and citations omitted).

All of Pineda-Pita's claims challenge the validity of the vehicle search. First, he claims that he was unlawfully detained, that he should have been allowed to drive away because he had a valid driver's license and was the owner of the vehicle, and that there was no probable cause to search the vehicle. Next, Pineda-Pita argues that the consent was invalid because it was obtained during an illegal seizure, the consent was not unequivocal, and he was not notified that he was free to leave. Pineda-Pita also claims that if we conclude that the consent was valid, then towing the vehicle to police barracks to conduct the search exceeded the scope of the consent. Finally, Pineda-Pita claims that *Gary*[2] does not extend to a situation where the vehicle is towed and searched at state police barracks.

_____

[2] *Gary* was decided by a six-justice Supreme Court. The opinion announcing the judgment of the Court adopted the federal automobile exception for warrantless vehicle searches – "[t]he prerequisite for a warrantless search of a motor vehicle is probable cause to search; no exigency beyond the inherent mobility of a motor vehicle is required." 91 A.3d at 138. Justice Saylor authored a concurrence, joining the lead opinion insofar as it adopted the federal rule. Justice Saylor, however, expressed concerns with adopting a bright-line rule. *Id.* at 139. This Court recently decided *Commonwealth v. Green*, wherein we held that "[p]olice may search an automobile without a warrant so long as they have probable cause to do so, as an automobile search 'does not require any exigency beyond the inherent

This Court has explained that when conducting a traffic stop, "[a] police officer has the authority to stop a vehicle when he or she has reasonable suspicion that a violation of the vehicle code has taken place, for the purpose of obtaining necessary information to enforce the provisions of the code." **Commonwealth v. Brown**, 64 A.3d 1101, 1105 (Pa.Super. 2013) (emphasis omitted). If, however, "the violation is such that it requires no additional investigation, the officer must have probable cause to initiate the stop." **Id.** (emphasis omitted).

> Put another way, if the officer has a legitimate expectation of investigatory results, the existence of reasonable suspicion will allow the stop—if the officer has no such expectations of learning additional relevant information concerning the suspected criminal activity, the stop cannot be constitutionally permitted on the basis of mere suspicion.

**Id.** (quoting **Commonwealth v. Chase**, 960 A.2d 108, 115 (Pa. 2008)).

Initially, we note that Pineda-Pita does not dispute the legality of the traffic stop. Corporal Grenci testified that he saw the vehicle traveling eastbound and "all the windows were completely tinted, completely dark. I couldn't see anything inside the vehicle." N.T., 5/18/15, at 10-11. This was sufficient to establish probable cause[3] of a violation of section 4524(e)(1) of

---

mobility of a motor vehicle.'" 168 A.3d 180, 186 (Pa.Super. 2017) (quoting **Gary**, 91 A.3d at 104).

[3] In determining the validity of the traffic stop, the trial court applied a reasonable suspicion standard. However, a traffic stop due to a vehicle having heavily tinted windows must be supported by probable cause. **See**

the Vehicle Code, 75 Pa.C.S. § 4524(e)(1). *See Commonwealth v. Randolph*, 151 A.3d 170, 176 (Pa.Super. 2016), *app. denied*, 168 A.3d 1284 (Pa. 2017).

Pineda-Pita argues that his continued seizure, following the seizure of Garcia, was not supported by probable cause and therefore was unlawful. "The matter of when a traffic stop has concluded or otherwise given way to a new interaction does not lend itself to a 'bright[-]line' definition." *Commonwealth v. Reppert*, 814 A.2d 1196, 1202 (Pa.Super. 2002). In *Commonwealth v. Strickler*, 757 A.2d 884 (Pa. 2000), the Pennsylvania Supreme Court "analyzed under what circumstances a police interdiction can devolve into a mere encounter following a traffic stop when police continue to question the person after the reason for the traffic stop has concluded." *Commonwealth v. Kemp*, 961 A.2d 1247, 1253 (Pa.Super. 2008) (*en banc*). The *Strickler* Court "ruled that after police finish processing a traffic infraction, the determination of whether a continuing interdiction constitutes a mere encounter or a constitutional seizure centers upon whether an individual would objectively believe that he was free to end the encounter and

---

*Commonwealth v. Randolph*, 151 A.3d 170, 176 (Pa.Super. 2016), *app. denied*, 168 A.3d 1284 (Pa. 2017). While the trial court applied the wrong standard, we conclude this error was harmless because the record shows the traffic stop was supported by probable cause. *See Commonwealth v. Kennedy*, 151 A.3d 1117, 1127 n.14 (Pa.Super. 2016) ("It is well-settled that this Court may affirm a trial court's ruling on any basis.").

refuse a request to answer questions." *Id.*

Here, the police had not finished processing the traffic infraction. Corporal Grenci conducted a traffic stop because of the vehicle's heavily tinted windows. Upon running Garcia's identification card,[4] Corporal Grenci determined that Garcia did not have a valid driver's license and had an active arrest warrant. N.T., 5/18/15, at 13. After Garcia was taken into custody, Corporal Grenci returned to the vehicle and explained to Pineda-Pita why Garcia had been taken into custody. *Id.* at 14-15. Pineda-Pita argues that he should have been allowed to leave at that point because he had a valid driver's license and was the owner of the vehicle. Pineda-Pita's Br. at 14. Pineda-Pita ignores, however, that the traffic stop had not concluded. Corporal Grenci had not yet issued a written warning or traffic citation, N.T., 5/18/15, at 38, and as long as the traffic stop was still in progress, Corporal Grenci had no obligation to permit Pineda-Pita to leave.

Next, we must determine whether Pineda-Pita's consent for the search of the vehicle was valid. The Commonwealth bears the burden of proving "that a consent is the product of an essentially free and unconstrained choice — not the result of duress or coercion, express or implied, or a will overborne — under the totality of the circumstances." *Commonwealth v. Powell*, 994

---

[4] When Corporal Grenci asked Garcia for his driver's license Garcia produced an identification card. N.T., 5/18/15, at 11. Garcia stated that he had a license but did not have it with him at the time. *Id.*

A.2d 1096, 1101-02 (Pa.Super. 2010) (quoting **Kemp**, 961 A.2d at 1261).

"While knowledge of the right to refuse to consent to the search is a factor to be taken into account, the Commonwealth is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." **Id.** (quoting **Kemp**, 961 A.2d at 1261). This Court has set forth several factors to determine whether a consent is valid:

> 1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including the degree of coerciveness; 8) whether the person has been told that he is free to leave; and 9) whether the citizen has been informed that he is not required to consent to the search.

**Id.** (quoting **Kemp**, 961 A.2d at 1261).

We must determine whether Pineda-Pita's consent was a free and unconstrained choice under the totality of the circumstances.[5] **See Powell**, 994 A.2d at 1101-02.

The trial court found that:

> Corporal Grenci's testimony established that the questioning of [Pineda-Pita] took place in the open, no restraints were used, no aggressive behavior was shown, and the questions were not confusing or prolonged. [Pineda-Pita] argues that after Corporal Grenci asked to search the vehicle, and [Pineda-Pita] responded "Go ahead", the fact that the

---

[5] Because we have concluded the traffic stop was supported by probable cause and had not ended at the time Pineda-Pita gave his consent, Pineda-Pita's argument that the consent was invalid because it was obtained during an illegal seizure fails.

> Corporal followed up with "Are you sure?" and "That's a yes?" means that his consent was not unequivocal or specific. This Court does not agree and finds Corporal Grenci was ensuring he had consent after [Pineda-Pita] initially seemed reluctant to permit a search. Despite the fact that Corporal Grenci did not specifically advise [Pineda-Pita] that he did not have to consent, or that he was free to leave, this Court finds that the totality of the circumstances supports the conclusion that the [Pineda-Pita]'s consent was voluntary.

Trial Ct. Op., 9/18/15, at 9-10. We conclude that the trial court's determination that Pineda-Pita's consent was valid is supported by the record.

We must next determine whether the officers were permitted to continue the search of the vehicle at police barracks. In **Gary**, our Supreme Court clarified that "[t]he prerequisite for a warrantless search [or seizure] of a motor vehicle is probable cause to search; no exigency beyond the inherent mobility of the vehicle is required." 91 A.3d at 138. We have explained:

> "It is only the probability and not a *prima facie* showing of criminal activity that is a standard of probable cause." **Commonwealth v. Monaghan**, 441 A.2d 1318 (Pa.Super. 1982) (citation omitted); **see also Illinois v. Gates**, 462 U.S. 213, 238 (1983) (holding that probable cause means "a fair probability that contraband or evidence of a crime will be found."); **Commonwealth v. Lindblom**, 854 A.2d 604, 607 (Pa.Super. 2004) (reciting that probable cause exists when criminality is one reasonable inference, not necessarily even the most likely inference).

**Commonwealth v. Freeman**, 128 A.3d 1231, 1242-43 (Pa.Super. 2015) (quoting **Commonwealth v. Dommel**, 885 A.2d 998, 1002 (Pa.Super. 2005)) (alterations omitted).

In conducting the consent search, Corporal Grenci testified that: as he opened the vehicle's back door to remove the back-seat passenger, Contreras,

- 11 -

he smelled fresh marijuana; he also smelled fresh marijuana on Contreras as he patted him down; he first searched the spare tire mounted under the car because of Pineda-Pita's actions during the request for consent; "in plain view," through the holes in the wheel well, he saw black garbage bags wrapped in gray duct tape; and based on his training and experience, he determined the packaging was "illegal contraband, most likely drugs." N.T., 5/18/15, at 17-19. These observations, along with the evidence that the vehicle's occupants were from common drug source areas; the driver was wanted for drug trafficking violations; Pineda-Pita seemed unsure when asked about their travel plans; and, when asked for consent to search the vehicle, Pineda-Pita looked toward the rear of the vehicle and uttered the word "shit," were more than sufficient to establish probable cause. **See Commonwealth v. Nobalez**, 805 A.2d 598, 600 (Pa.Super. 2002) ("We do not review the evidence piecemeal, but consider the totality of the circumstances in assessing whether probable cause existed."); **see also Commonwealth v. Evans**, 661 A.2d 881, 889 (Pa.Super. 1995) (holding that officer had probable cause when appellee opened the car door and officer saw a brick-shaped object covered in plastic, the brick-shaped object was partially concealed under the driver's seat, and appellee had nervous demeanor"). Therefore, once Corporal Grenci had probable cause, the search of the vehicle was supported by the automobile exception. **See Gary**, 91 A.3d at 138.

Further, that the inside of the vehicle was searched after it was removed from the highway and towed to a safe location does not alter our conclusion. *See Gary*, 91 A.3d at 110 ("[W]hile a vehicle's ready mobility was the original justification for the automobile exception to the warrant requirement, the U.S. Supreme Court subsequently broadened this justification to encompass those situations where the vehicle was in police custody and thus was immobilized."); *see also Michigan v. Thomas*, 458 U.S. 259, 261 (1982) ("In *Chambers v. Maroney*, 399 U.S. 42, . . . (1970), we held that when police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody.").[6]

Accordingly, we conclude that the trial court did not err in denying Pineda-Pita's motion to suppress.[7]

Judgment of sentence affirmed.

_____

[6] Because we conclude that the automobile exception allowed the warrantless search of the vehicle once probable cause was established, we need not reach the question of whether Pineda-Pita's consent to the search of the vehicle extended to the towing of the vehicle to police barracks.

[7] *See Kennedy*, 151 A.3d at 1127 n.14.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/20/2017