J-A17030-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| MORRIS MONTANEZ | : | |
| | : | |
| Appellant | : | No. 1239 EDA 2019 |

Appeal from the Judgment of Sentence Entered April 12, 2019
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0002957-2018

BEFORE: BOWES, J., McCAFFERY, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY McCAFFERY, J.: **FILED AUGUST 17, 2020**

Morris Montanez (Appellant) appeals from the judgment of sentence entered in the Delaware County Court of Common Pleas following his stipulated bench trial wherein he was convicted of three counts of possession of a controlled substance with intent to deliver (PWID)[1] methamphetamine, heroin, and cocaine. Appellant argues that his suppression motion was erroneously denied. For the reasons below, we affirm.

The trial court summarized the facts presented at Appellant's motion to suppress hearing and stipulated bench trial as follows:

> On February 14, 2017 [at] approximately 9:45 p.m., Officer Costello (employed with the Chester City Police Department at the time) was conducting a check of an area considered "high crime" by the Chester City Police Department. This area is considered

---

[1] 35 Pa.C.S. § 780-113(a)(30).

"high crime" due to frequently occurring homicides, open-air drug sales, drug investigations, and shootings.

Officer Costello was traveling north on the 90[0] block of Clover [Lane] approaching 10th Street at this time. Officer Costello watched as a silver sedan traveling east on 10th Street disregarded the stop sign posted at Clover Lane. Officer Costello proceed[ed] to follow the vehicle, where he witnessed the car disregard yet another stop sign at 10th and Booth Street[s]. Officer Costello proceeded to activate his lights and pulled the vehicle over midway down the block on the 1000 block of Harwick [Street].

As Officer Costello approached the vehicle, he smelled what he recognized to be burnt marijuana seven or eight feet from the vehicle. Officer Costello perceived the driver, [Appellant], to be nervous, breathing heavily and sweating despite the cold weather. Officer Costello introduced himself to [Appellant], told him the reason for the stop, and asked for his credentials. Officer Costello told [Appellant] he smelled [burnt, not fresh] marijuana and [Appellant] replied that he had been smoking in the car earlier.[2] Officer Costello discussed with [Appellant] that he had presented his state-issued identification card instead of a driver's license.[3] Officer Costello then asked [Appellant] if he would mind stepping out of the car so that he could conduct an investigation in the rear of the vehicle. [Appellant] complied and stepped out of the vehicle. Back-up officers had arrived by this time.

After [Appellant] stepped out of his vehicle, Officer Costello asked [Appellant] if he would be okay with patting him down for officer safety to make sure [Appellant] didn't have any firearms or anything that could hurt the officer on him. [Appellant] consented and told the Officer that he didn't have to worry about anything being in the car. During the pat-down, Officer Costello felt a large bag concealed in [Appellant's] pants around his belt buckle area, the front of his pelvis. Because of Officer Costello's

---

[2] Officer Costello testified that he suspected Appellant might have marijuana in his car or on his person. N.T., 10/25/18, at 42.

[3] Officer Costello testified that he took Appellant's identification and put it directly into his uniform pocket. N.T., 10/25/18, at 14.

training, he knew specifically that what he felt was bundles of [heroin].

Officer Costello proceeded to put [Appellant] in handcuffs and asked [Appellant] whether he wanted to tell him about what he felt in [Appellant's] pants. [Appellant] mentioned that it could be a bag of cocaine in his pants, turned around, and started running away from the Officer westbound across Harwick Street. Officer Costello chased [Appellant], apprehended him, and retrieved the bag from his pelvis area. After Officer Costello stood [Appellant] up and walked him back to the car, [Appellant] started running away again, this time southward down Harwick [Street]. Officer Costello, with the help of the other officers, apprehended [Appellant] again, told him to stop running, and placed him in the back of the [police] vehicle. Officer Costello inspected the bag and discovered multiple bundles of heroin, bags of crystal meth, and bags of cocaine. Officer Costello also discovered a large quantity of cash in [Appellant's] pocket, approximately $790. A search of [Appellant's] vehicle revealed six cellphones and mini rubber bands.

Trial Ct. Op., 7/19/19, at 2-4 (references to notes of testimony omitted).[4]

Appellant presents three arguments for our review: (1) the trial court erred in finding that the officer had reasonable suspicion to conduct a **Terry**[5] frisk of the Appellant, **see** Appellant's Brief at 8-12; (2) the trial court erred in finding that the officer's search of Appellant, notably reaching into his pants, did not exceed the scope of a **Terry** frisk and was supported by probable

---

[4] Appellant was convicted at a stipulated bench trial on April 12, 2019, and immediately sentenced to an aggregate term of 18 to 36 months' imprisonment with a four-year probationary tail; the trial incorporated testimony from a suppression hearing on October 25, 2018. On April 16th, he filed the present appeal, and on May 30th he filed a timely statement per Pa.R.A.P. 1925(b).

[5] **Terry v. Ohio**, 392 U.S. 1 (1968).

- 3 -

cause; *id.* at 12-16; and (3) while Appellant may have consented to the searches that led to his arrest, his consent was not willful — rather, he was coerced into giving Officer Costello permission. *Id.* at 17-22.

The Commonwealth responds that the trial court did not err in its findings and conclusions, Officer Costello properly conducted a *Terry* frisk, and Appellant consented willingly and without coercion. *See* Commonwealth's Brief at 8-19. Finally, the Commonwealth argues that in any event, discovery was inevitable and therefore suppression would have been error. *Id.* at 20-22.

The trial court determined Officer Costello had reasonable suspicion to conduct a *Terry* frisk on Appellant. Trial Ct. Op. at 4-5. The trial court also found that Officer Costello's search of Appellant did not exceed the scope of a *Terry* frisk and was supported by probable cause, and Appellant voluntarily consented to a search of his person. *Id.* at 5-12.

We adhere to the following standard:

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty is to determine if the suppression

court properly applied the law to the [trial court's] facts. Thus, the conclusions of law are subject to our plenary review.

***Commonwealth v. Shreffler***, 201 A.3d 757, 763 (Pa. Super. 2018) (citation omitted).

The main purpose of both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution is to protect citizens from unreasonable searches and seizures. ***Commonwealth v. Hill***, 874 A.2d 1214, 1217 (Pa. Super. 2005). "Not every encounter between citizens and the police is so intrusive as to amount to a 'seizure' triggering constitutional concerns." ***Id.***

> Traditionally, this Court has recognized three categories of encounters between citizens and the police. These categories include (1) a mere encounter, (2) an investigative detention, and (3) custodial detentions. The first of these, a "mere encounter" (or request for information), [need] not be supported by any level of suspicion but carries no official compulsion to stop or to respond. The second, an "investigative detention[,]" must be supported by reasonable suspicion; it subjects a suspect to a stop and a period of detention but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

***Commonwealth v. Collins***, 950 A.2d 1041, 1046 (Pa. Super. 2008) (citation omitted).

Officers have the right to conduct traffic stops for violations of our motor vehicle code; therefore, the officer was justified in pulling Appellant over for disregarding two stop signs. ***See Commonwealth v. Mack***, 953 A.2d 587, 589 (Pa. Super. 2008). An officer has the right to check vehicle registration,

the driver's license, and any other information required to enforce the motor vehicle code, and to ask the occupants to exit the vehicle. **See id.** at 589. An officer who observes unusual and suspicious behavior that leads the officer to a reasonable belief that the individual may be armed and dangerous has the right to pat down the individual's outer garments for weapons. **See id.** at 590.

To justify a frisk, an officer must establish reasonable suspicion by articulating specific facts from which the officer could reasonably infer that the individual was armed and dangerous. **See id.** When this Court assesses the frisk, we examine the totality of the circumstances, giving due consideration to reasonable inferences that the officer can draw from the facts in light of his experience. **See id.**

Factors like the time of day also impact the "totality of the circumstances" analysis. This encounter was at night, and this Court has observed that such encounters carry more inherent risk. **See, e.g., Commonwealth v. Cooper**, 994 A.2d 589, 594 (Pa. Super. 2010) (distinguishing faulty pat-down during the day from several valid ones occurring "late at night").

We conclude the trial court was right that the arresting officer had reasonable suspicion, sufficient to support a **Terry**-level encounter, when Appellant confirmed that his car smelled like burnt marijuana because he had smoked in the car earlier. At this point, the officer already knew that Appellant

disregarded two stop signs and was likely under the influence of an intoxicant while driving. There is no doubt the officer was justified in pulling over Appellant's vehicle when he observed him disregard two stop signs — not even Appellant argues against this. In **Commonwealth v. Simmons**, 17 A.3d 399, 401 (Pa. Super. 2011), this Court affirmed the denial of suppression where police pulled the defendant over for a minor traffic violation in a high-crime area. The arresting officers observed the defendant move to conceal something on his person as they approached. **Id.** This conduct was enough to justify a protective pat-down under **Terry** and its progeny. **Id.** at 403-04. During that pat-down, the officer felt numerous small cylinders, which he knew to be consistent with drug packaging. **Id.** at 401.

Appellant's situation is analogous to **Simmons**. Both the defendant in **Simmons** and Appellant were pulled over for traffic violations in high-crime areas. While the defendant in **Simmons** (unlike Appellant) was spotted moving to conceal something, both were subjected to a **Terry** frisk in which both officers recognized common narcotics packaging. In **Simmons**, the containers were vials, and here the containers were wax paper bundles.[6] **See** N.T., 10/25/18, at 55-57. Unlike in **Simmons**, here Appellant acknowledged

---

[6] The Commonwealth's expert estimated that the street value of the narcotics in Appellant's pocket was approximately $2,000. N.T., 5/9/18, at 22. Appellant was carrying 105 individual bags of heroin, in addition to cocaine and methamphetamine. **Id.**

having smoked an intoxicant in the car, and had smoked it recently enough that the car still bore a strong smell of burnt marijuana.

Appellant argues that a high-crime area alone does little to establish reasonable suspicion. Appellant's Brief at 10. Appellant is correct to say that a high-crime area **alone** does not establish reasonable suspicion; however, here, the officer had more than just the fact of a high-crime area to support his reasonable suspicion. The officer noted Appellant was unable to give a good explanation of where he was coming from. *See* N.T., 10/25/18, at 41. The officer also observed Appellant breathing heavily, appearing nervous, and sweating despite the cold weather. *See id.* at 40. Further, **Appellant confessed** at the beginning of the interaction with the officer that he had smoked an intoxicant in the vehicle earlier. *See id.* at 13. The officer's observations, combined with Appellant's confession, established reasonable suspicion.

Appellant himself established that he was likely driving under the influence of an intoxicant (DUI), and thus the officer was fully justified in prolonging the interaction to ensure the safety of all involved, including Appellant.[7] A DUI stop necessarily involves interactions that are long enough for the investigating officer to determine whether there is probable cause for

---

[7] Although Appellant was not ultimately charged with a violation of 75 Pa.C.S. § 3802, our DUI statute, it is nevertheless relevant to assessing probable cause.

an arrest. During this prolonged investigation, an officer may need to conduct a roadside sobriety test and engage in conversation meant to gauge the driver's ability to maintain alertness and presence of mind. These investigations must be conducted in close proximity to allow the officer to look for bloodshot eyes or dilated pupils and to smell intoxicants if present on a driver's breath. With these close-up and prolonged interactions, an officer is at risk due to the unpredictable behavior of someone whose judgment is potentially impaired.[8] The impaired individual may react poorly to the investigation, and because of this an officer may have to perform **Terry** pat-downs during DUI-related traffic stops.

Furthermore, the arresting officer did not actually reach into Appellant's pocket until he had already attempted to run from the scene of the traffic stop, after telling the officer that there were narcotics in his pants. At each step of the encounter, Appellant gave accurate and incriminating responses to the officer's reasonable questions. Here, the officer's experience led him to conclude immediately that the bundle in Appellant's pocket was packaged narcotics, but first he asked Appellant about it. Appellant responded that it

---

[8] Our Supreme Court has recognized the dangers inherent to the field sobriety testing scenario. *See, e.g., Commonwealth v. Revere*, 888 A.2d 694, 704 n.12 (Pa. 2005), *citing Commonwealth v. Blais*, 428 Mass. 294, 701 N.E.2d 314, 316–17 (1998) (safety reasons warrant moving alleged drunk driver to administer sobriety test).

"could be" cocaine.[9]   Certainly, no one could dispute that the officer had probable cause at that point.   Appellant argues that going into his pocket exceeded the bounds of a *Terry* frisk, but can cite no authority to get around the fact that Appellant was remarkably forthcoming about the narcotics in his pocket, and his statement certainly established sufficient grounds for his arrest and search incident to arrest.

The officer also asked Appellant whether he could search his car, and whether he could pat him down.   Appellant consented verbally to both procedures.   Appellant now argues that his consent was coerced rather than freely given.   However, Appellant's encounter escalated quickly and organically, based on the answers and cues Appellant was giving (nervousness, smell of burnt marijuana, careless driving).   The questions he was asked arose from those cues.

We evaluate claims that consent was coerced by applying a "totality of the circumstances" approach.   *See Commonwealth v. Kemp*, 961 A.2d 1247, 1261 (Pa. Super. 2008), *quoting Commonwealth v. Strickler*, 757 A.2d 884, 901-02 (Pa. 2000).   *Strickler* provides a non-exclusive list of factors to consider:

---

[9] *See* N.T., 10/25/18, at 19.  Appellant argues that the "plain feel" doctrine was misapplied here, but that doctrine would only apply had the officer gone straight into the pocket without asking about its contents.  That is not what happened.  Once Appellant confessed that it "could be" cocaine, the officer was no longer relying on plain feel.  *See id.* at 19.

> 1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including its degree of coerciveness; 8) whether the person has been told that he is free to leave; and 9) whether the citizen has been informed that he is not required to consent to the search.

***Kemp***, 961 A.2d at 1261, *citing* ***Strickler***, 757 A.2d at 898-99.

Here, the location of the traffic interdiction and the late hour would tend to establish the need, on the part of the officer, to keep both parties safe by directing some movement (to make sure, for instance, they are not endangered by oncoming traffic). Nothing indicates that the police demeanor was particularly stern. The content of the questions and statements was organic rather than arbitrary, arising as it did from the obvious smell of burnt narcotics as the officer approached the car. There was physical contact, but it was, until Appellant attempted to run, the minimum contact that would accomplish the ***Terry*** pat-down. The initial investigation was minimally coercive, and is of a character that most drivers will experience at some point in their lives. On the other hand, Appellant was not informed that he was free to leave (as he was not — the investigation into his competency to drive was still ongoing), and although the questions do not appear to have been phrased in any particularly hostile or coercive manner, they did not contain a warning that Appellant was free to refuse.

- 11 -

Appellant points to two primary factors in alleging that the stop became coercive: first, that the officer called for backup, and backup arrived by the time the officer went into his pocket; and second, that the officer kept his identification in his pocket during the encounter. Appellant is correct that the retention of an ID is a factor in the "totality of the circumstances" analysis. *See Commonwealth v. Cost*, 224 A.3d 641 (Pa. 2020). However, even if we were to find the officer's retention of Appellant's ID to be problematic in this circumstance, it cannot eclipse the many indicia of probable cause arising from Appellant's behavior. Notably, Appellant did not give the officer a driver's license; rather, he proffered a state-issued identification card. Trial Ct. Op. at 3.

The fact that the officer called for backup shows that he was worried, upon observing Appellant's nervousness and learning that he might be under the influence of an intoxicant (and therefore might need to be taken into custody for everyone's safety, including his own), that Appellant might behave erratically. The officer's instincts proved useful, as Appellant attempted flight during the arrest. Appellant conflates the circumstances surrounding freedom to leave with the circumstances surrounding freedom to refuse. Further, Appellant identifies no authority to establish that asking to search a car coupled with a pat-down during a traffic stop, without more, constitutes coercion. Although the officer called for backup, Appellant has not established

that the timing or presence of those backup officers affected his consent or established coercion.

The Commonwealth is also correct that, because the arresting officer could not release a potentially intoxicated driver without further investigation, discovery of the contraband was inevitable. Pennsylvania applies the inevitable discovery doctrine outlined in *Nix v. Williams*, 467 U.S. 431 (1984). "[E]vidence which would have been discovered [is] sufficiently purged of the original illegality to allow [its] admission." *Commonwealth v. Gonzalez*, 979 A.2d 879, 890 (Pa. Super. 2009) (citations omitted).

Appellant made the decision, after announcing that the bulge in his pocket could be cocaine, to run. He made an incriminating decision forcing Officer Costello to escalate the encounter to a full arrest, during which, a search incident to arrest was indeed inevitable.

Because the search of Appellant's person was appropriate, given Officer Costello's need to investigate the road-worthiness of a driver who had just freely admitted recently smoking marijuana in his car, and because Appellant's subsequent indication that he was carrying cocaine and attempt at flight made arrest appropriate and a search inevitable, the trial court correctly denied Appellant's suppression motion.

Judgment of sentence affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/17/20</u>