J-S37041-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LAMONT DRAINE, JR. | : | |
| | : | |
| Appellant | : | No. 82 EDA 2022 |

Appeal from the Judgment of Sentence Entered November 23, 2021
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0007384-2019

BEFORE: BOWES, J., LAZARUS, J., and OLSON, J.

MEMORANDUM BY OLSON, J.: **FILED NOVEMBER 1, 2023**

Appellant, Lamont Draine, Jr., appeals from the judgment of sentence entered on November 23, 2021, following a stipulated bench trial conviction for firearms not to be carried without a license, 18 Pa.C.S.A. § 6106(a)(2). We vacate and remand.

The trial court summarized the facts of this case as follows:

Officer Dylan Glenn ("Officer Glenn") and Officer Charles Waters ("Officer Waters") [] are patrolmen with Chester Township Police Department. On November 21, 2019 at 12:46 a.m.[,] the officers were on patrol. Both officers were parked at the intersection of 11th Street and Engel Street. Officer Glenn was in his marked police vehicle, which was parked, facing east. Officer Waters was in his marked police vehicle, which was parked, facing west. The officers were talking to each other.

Officer Glenn testified that, during the span of his then two (2) year employment as a patrolman in Chester Township, he had made approximately fifteen (15) arrests in the general area surrounding the intersection of 11th Street and Engel Street. He further testified that he was familiar with other officers making arrests in this area and believed, based upon his experience, that more crimes are committed in this general area than other areas within Chester Township. Officer Glenn testified further that more calls for police occur during the nighttime hours than the daytime hours.

While the officers were talking to each other, they observed two men, later identified as Appellant [] and Mr. Lawrence Cook ("Cook"), walking east on 11th Street in the middle of the roadway. The two men continued to walk in the middle of the roadway as they approached the intersection and did not make any effort to walk on the sidewalk or the shoulder of the road, even though there was a sidewalk and shoulder available. By walking in the middle of the roadway, the two men were in violation of a Motor Vehicle Code provision which prohibits pedestrian travel on a roadway when a sidewalk is available. *See* [] 75 Pa.C.S.A. § 3544(a) (relating to mandatory use of a sidewalk).

Officer Glenn and Officer Waters made contact with [Appellant] and Cook, as they approached the intersection of 11th Street and Townsend Street. The officers identified themselves as [] police officers, asked the men for identification, and informed them as to why they were detained. The men responded by identifying themselves and informing the officers that they did not understand the reason for the detention.

The officers informed them that they were being detained because they were walking in the middle of the street when a sidewalk was available for use. The men responded by arguing with the officers and insisting that there was no sidewalk available for them. The officers indicated to the available sidewalk and told them that even if there is no sidewalk available, they were still required to travel on the shoulder of the road and not in the middle of the road, in order to be compliant with the law.

Officer Waters asked [Appellant] if he had any objects on his person that could potentially hurt Officer Waters. [Appellant] responded by informing the officers that he had a firearm. The [o]fficers then asked [Appellant] for the specific location of the firearm and [Appellant] responded that it was in his backpack.

J-S37041-22

> The officers then patted down both men and recovered the firearm from [Appellant's] backpack. After recovering the firearm, Officer Glenn returned to his vehicle and ran the information [obtained] from both men "through multiple databases … to find their correct identity [and to check for] warrants … and to locate a valid permit to carry [a firearm] for [Appellant]." After checking various databases, [Officer Glenn] determined that [Appellant] did not have a valid license to carry a concealed weapon.

Trial Court Opinion, 2/3/2022, at *2-4 (unpaginated).

> Procedurally, the case progressed as follows:

> On November 21, 2019, [Appellant] was arrested and charged with (1) Count I – violation of 18 Pa.C.S.A. § 6106(a)(2), [f]irearms not to be carried without a license; (2) Count II – violation of 75 Pa.C.S.A. § 3544(a), [m]andatory use of a sidewalk. On August 11, 2020, [Appellant] filed an [o]mnibus [p]retrial [m]otion for [r]elief, which contained a request for suppression of evidence. On September 1, 2020, [the trial c]ourt held a hearing relative to [Appellant's] request for suppression of the evidence. On November 12, 2020, [the trial c]ourt entered an [o]rder which denied [Appellant's] request for suppression. On September 7, 2021, a stipulated non-jury trial was held after which [Appellant] was found guilty of the [firearm] charge[.[1]] On November 23, 2021, [Appellant] was sentenced to 72 hours to [six] months of incarceration with [one] year of concurrent probation.

*Id.* at *1-2 (unpaginated). This timely appeal resulted.[2]

---

[1] At trial, the Commonwealth did not pursue the mandatory use of a sidewalk charge. *See* N.T., 9/2/2021, at 8; *see also* Appellant's Brief at 7.

[2] Appellant filed a timely notice of appeal on December 17, 2021. On December 21, 2021, the trial court entered an order directing Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied on January 10, 2022. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on February 3, 2022. In its opinion, the trial court initially determined that Appellant's Rule 1925(b) statement "set[ting] forth nineteen (19) allegations of error" was "hardly concise and [was] replete with redundancy." Trial Court Opinion, 2/3/2022, at *5

- 3 -

On appeal, Appellant presents the following issues for our review:

Whether [Appellant] was lawfully stopped by the police officers?

Whether the officer's conduct, subsequent to the stop, in questioning [Appellant] and seizing the firearm inside his backpack, constituted an unreasonable search and seizure in violation of his constitutional rights?

Whether [] the firearm and Appellant's statements should have been suppressed as fruits of the poisonous tree where the police illegally prolonged a routine traffic stop without reasonable suspicion to conduct an[] unrelated investigation into whether Appellant was legally allowed to carry a firearm?

Whether [] the tr[ia]l court erred in finding [Appellant] guilty of carrying a firearm without a license, when the Commonwealth [] dismissed the underlying traffic [] violation, [] 75 [Pa.C.S.A. § 3544(a),] mandatory use of an available sidewalk, prior to trial and finding any requisite probable cause for [a] stop and search[?]

Appellant's Brief at 4 (unnecessary capitalization and suggested answers omitted).

---

(unpaginated). The trial court consolidated Appellant's allegations into two issues:

1. Whether [Appellant] was lawfully stopped by police officers[?]

2. Whether the officers' conduct, subsequent to the stop, in questioning [Appellant] and seizing the firearm inside his backpack, constituted an unreasonable search and seizure in violation of his constitutional rights[?]

*Id.* at *6 (unpaginated). The Commonwealth argues that Appellant waived his issues because his concise statement failed to comply with Rule 1925(b). *See* Commonwealth's Brief at 6 n.1. We disagree with this argument since the trial court distilled Appellant's issues into distinct claims, showing that Appellant's Rule 1925(b) concise statement did not obscure the arguments Appellant wished to raise on appeal.

Our Supreme Court previously determined the standard of review governing an order denying a motion to suppress:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where [ ] the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the [trial] court [] below are subject to our plenary review.

*Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010) (internal citations and quotations omitted).

Regarding police searches and seizures, this Court has opined:

> The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee the right of the people to be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures. To secure the right of citizens to be free from unreasonable search and seizure, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty. Because interactions between law enforcement and the general citizenry are widely varied, search and seizure law looks at how the interaction is classified and if a detention has occurred.
>
> The law recognizes three distinct levels of interaction between police officers and citizens: (1) a mere encounter; (2) an

- 5 -

investigative detention, often described as a **Terry** stop, **see Terry v. Ohio**, 392 U.S. 1 (1968); and (3) a custodial detention.

A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond and therefore need not be justified by any level of police suspicion.

In contrast, an investigative detention carries an official compulsion to stop and respond. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity.[3]

Finally, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest. This level of interaction requires that the police have probable cause to believe that the person so detained has committed or is committing a crime.

**Commonwealth v. Muhammad**, 289 A.3d 1078, 1086–1087 (Pa. Super. 2023) (some internal citations omitted).

---

3   Our Supreme Court has held:

A police officer may detain an individual in order to conduct an investigation if that officer reasonably suspects that the individual is engaging in criminal conduct. This standard, less stringent than probable cause, is commonly known as reasonable suspicion. In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give due weight to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

**Commonwealth v. Rogers**, 849 A.2d 1185, 1189 (Pa. 2004) (internal citations, quotations, ellipses omitted).

This Court has recognized that "routine constitutional analysis requires courts to utilize facts gathered during each escalating phase of a police investigation in determining whether police acted properly as the interaction between police and citizen proceeded towards an arrest." ***Commonwealth v. Kemp***, 961 A.2d 1247, 1258–1259 (Pa. Super. 2008). "[W]e have said repeatedly that [courts] must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." ***Id.*** at 1258, *citing **United States v. Arvizu***, 534 U.S. 266 (2002). "A totality-of-the-circumstances approach allows the court to consider all facts at the officer's disposal and does not require the court to disregard those adduced during a valid interdiction[.]" ***Id.***

With a recitation of the foregoing legal precepts, we now apply those principles to the facts of this case, as established at the suppression hearing, and by looking at each individual phase of the police investigation to determine whether police conduct conformed to law as the interaction proceeded towards conclusion. Here, Officers Glenn and Waters initially stopped Appellant for walking in a roadway when there was an available sidewalk. Section 3544 of the Motor Vehicle Code provides, in relevant part:

> **(a) Mandatory use of available sidewalk**.--Where a sidewalk is provided and its use is practicable, it is unlawful for any pedestrian to walk along and upon an adjacent roadway.
>
> **(b) Absence of sidewalk**.--Where a sidewalk is not available, any pedestrian walking along and upon a highway shall walk only on a shoulder as far as practicable from the edge of the roadway.

(**c) Absence of sidewalk and shoulder.**--Where neither a sidewalk nor a shoulder is available, any pedestrian walking along and upon a highway shall walk as near as practicable to an outside edge of the roadway and, if on a two-way roadway, shall walk only on the left side of the roadway.

75 Pa.C.S.A. § 3544(a)-(c).

"[T]his Court [has] held that a police officer must have probable cause to support a [] stop where the officer's investigation subsequent to the stop serves no investigatory purpose relevant to the suspected Vehicle Code violation." *Commonwealth v. Venable*, 200 A.3d 490, 498 (Pa. Super. 2018) (internal citation, quotations and original brackets omitted). Furthermore, we recently observed:

> Any technical traffic violation (supported by probable cause) legitimizes a stop, even if it is merely a pretext for some other investigation. *See Whren v. United States*, 517 U.S. 806 (1996). "During a traffic stop, the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Commonwealth v. Harris*, 176 A.3d 1009, 1020 (Pa. Super. 2017) (citation and internal quotation marks omitted). "[I]f there is a legitimate stop for a traffic violation ... additional suspicion may arise before the initial stop's purpose has been fulfilled, then, detention may be permissible to investigate the new suspicions." *Id.* (citation omitted). This further detention must be supported by reasonable suspicion[.]

*Commonwealth v. Burger*, 2023 WL 4348334, at *5 (Pa. Super. 2023) (unpublished memorandum).[4]

---

[4] *See* Pa.R.A.P. 126(b) (unpublished non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value).

Officer Glenn testified that, while sitting in his marked police car, he saw Appellant walking with Cook "[i]n the middle of the roadway" on 11th Street in Chester Township despite the availability of a sidewalk. N.T., 9/1/2020, at 18-19. Officer Glenn believed Appellant to be in violation of Section 3544. *Id.* at 20 (Officer Dylan Glenn testified that he stopped Appellant for "the violation of walking in the street when a sidewalk is provided."). Officer Glenn agreed that Appellant was walking in a normal manner and that he did not observe or suspect any criminal activity (aside from walking in the street). *Id.* at 32-34, 37. Officer Glenn "turn[ed] some bright lights on, li[t] up the area, [and] called [the two men] over. *Id.* at 24. Appellant asked why he was being stopped. *Id.* at 40. Officer Glenn asked for identification and explained the reason for the stop. *Id.* at 20. More specifically, Officer Glenn replied, "You're walking in the middle of the street." *Id.* According to Officer Glenn, in response, Appellant and Cook "tried to argue that there was not a sidewalk available for them." *Id.* Officer Glenn showed the two men the sidewalk that was available to them and further "advised them at that point that if there's no sidewalk available, they need to walk on the shoulder of the roadway." *Id.* Officer Waters testified similarly about the initial stop. *Id.* at 60-67.

Based upon our review, we conclude that the officer's observations established probable cause to believe that Appellant was not in compliance with the Vehicle Code, thereby justifying initiation of the stop. As such, the trial court correctly determined that, under Section 3544, the officers had

probable cause to stop Appellant for walking in the middle of street when a sidewalk was available for pedestrian travel. *See* Trial Court Opinion, 2/3/2022, at *9-10 (unpaginated).

The officers then proceeded to conduct a protective frisk of Appellant to determine if he were armed and dangerous. Police are permitted to conduct "a limited search for weapons where an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others." ***Commonwealth v. Hicks***, 208 A.3d 916, 933 (Pa. 2019), *citing* ***Terry v. Ohio***, 392 U.S. 1 (1968).

> [A] "stop and frisk" [i]s constitutionally permissible if two conditions are met. First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, ***Terry*** determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.

***Hicks***, 208 A.3d at 933, *citing* ***Arizona v. Johnson***, 555 U.S. 323, 326-327 (2009) (emphasis omitted); ***see also Commonwealth v. Clinton***, 905 A.2d 1026, 1031 (Pa. Super. 2006) (officer's inquiry regarding presence of weapons during lawful traffic stop reasonably furthered interest in officer safety and constituted tolerable, minimal intrusion), *appeal denied*, 934 A.2d 71 (Pa. 2007). A suspect may also voluntarily consent to a police search. ***See Commonwealth v. Strickler***, 757 A.2d 884, 888 (Pa. 2000).

In this case, before patting Appellant down for officer safety, Officer Glenn's partner, Officer Waters, asked Appellant if he "had anything that was going to hurt" the officers. *Id.* at 22. Appellant volunteered that he had a firearm in his backpack. *Id.* Without incident, "Officer Waters removed the backpack off of [Appellant's] shoulders and retrieved a firearm that was in a brown holster." *Id.* at 23. The firearm was then secured in a police vehicle. *Id.* at 24. When asked again about the purpose of his subsequent database investigation, Officer Glenn responded it was "[t]o identify the subjects, make sure no one had any wants or warrants, and then confirm a possible concealed carry permit for [Appellant]." *Id.* at 26. Officer Glenn "returned to [his] vehicle and started running both subjects through multiple databases just to find their correct identities, wants, or warrants, and then [] once all that was finished, [he] tried to locate a valid permit to carry [a firearm] for [Appellant]" but to no avail. *Id.* Officer Glenn further testified that if Appellant had a valid firearm license and did not have any warrants, "[t]he firearm would have been returned safely to [Appellant], and they probably would have been sent on their way, possibly got a citation in the mail" for "walking in the street." *Id.* at 27.

Here, the trial court determined:

> The interaction occurred at 12:46 a.m. in an area known generally by the officers to be in an area of higher crime than other areas within the municipality. [Appellant] and Cook were arguing with the officers and [Appellant] was known to be in possession of a gun. An examination based upon the totality of the circumstances warrants the conclusion that the officers reasonably suspected [Appellant] to be armed and dangerous.

> The actions of the officers in securing the weapon and conducting a frisk for weapons were appropriately based upon that reasonable suspicion. Based upon the foregoing, [the trial court] denied [Appellant's] request for suppression.

*Id.* at \*14 (unpaginated). Again, we agree with the trial court's determination that the police were justified in making an initial stop and in conducting a protective frisk for their safety, especially in light of Appellant's voluntary consent. The trial court, however, erroneously ended its analysis after determining that the police had grounds to conduct a protective frisk (which we agree that they did, given Appellant's consent) without examining whether the police possessed reasonable suspicion to support a subsequent detention undertaken to ascertain Appellant's firearms licensure status (which, based upon *Hicks* and *Commonwealth v. Malloy*, 257 A.3d 142 (Pa. Super. 2021) we find that they lacked). Furthermore, as discussed later, we disagree with the trial court's factual finding that the officers knew Appellant was in possession of a firearm when he briefly argued with them about the initial stop.

With guidance from the United States Supreme Court, this Court has determined that courts are required to consider whether police unlawfully prolonged an initial traffic-related detention:

> The tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate that purpose." Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.

A traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete the mission" of issuing a warning ticket.... An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But ... he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.

Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to stop."  Typically, such inquiries involve checking [identification and] determining whether there are outstanding warrants[.]  These checks serve the same objective as enforcement of the traffic code: ensuring [roadway safety.]

**Malloy**, 257 A.3d at 149–150, *citing* **Rodriguez v. United States**, 575 U.S.

348, 354 (2015) (original brackets omitted).[5]

---

[5] Prior to the United States Supreme Court's decision in **Rodriguez**, this Court recognized that a constitutionally valid initial stop did not automatically support all subsequent police intrusions during the encounter.  In **Kemp**, we said:

In [**Strickler**, **supra**], our Supreme Court analyzed under what circumstances a police interdiction can evolve into a mere encounter following a traffic stop when police continue to question the person after the reason for the traffic stop has concluded.  The Supreme Court in **Strickler** ruled that after police finish processing a traffic infraction, the determination of whether a continuing interdiction constitutes a mere encounter or a constitutional seizure centers upon whether an individual would objectively believe that he was free to end the encounter and refuse a request to answer questions.

Our Supreme Court adopted a totality-of-the-circumstances approach. It delineated a non-exclusive list of factors to be used in making this assessment. Those factors include 1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location and time of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial

We are also mindful:

[The Pennsylvania Supreme Court recently found] no justification for the notion that a police officer may infer criminal activity merely from an individual's possession of a concealed firearm in public. […It] is not a criminal offense for a license holder [] to carry a concealed firearm in public. Although the carrying of a concealed firearm is unlawful for a person statutorily prohibited from firearm ownership or for a person not licensed to do so, *see* 18 Pa.C.S.A. §§ 6105-06, there is no way to ascertain an individual's licensing status, or status as a prohibited person, merely by his outward appearance. As a matter of law and common sense, a police officer observing an unknown individual can no more identify whether that individual has a license in his wallet than discern whether he is a criminal. Unless a police officer has prior knowledge that a specific individual is not permitted to carry a concealed firearm, and absent articulable facts supporting reasonable suspicion that a firearm is being used or intended to be used in a criminal manner, there simply is no justification for the conclusion that the mere possession of a firearm, where it lawfully may be carried, is alone suggestive of criminal activity.

*Hicks*, 208 A.3d at 936–937.

This Court has further recognized that when a firearm is secured by police without incident during a protective frisk, but before requesting documentation that the firearm is lawfully in the person's possession, the

---

investigative detention, including its degree of coerciveness; 8) the degree to which the transition between the traffic stop/investigative detention and the subsequent encounter can be viewed as seamless, ... thus suggesting to a citizen that his movements may remain subject to police restraint; and 9) whether there was an express admonition to the effect that the citizen-subject is free to depart, which is a potent, objective factor. Our Supreme Court also observed that when an individual has been subjected to a valid detention but police continue to engage the person in conversation, the person is less likely to reasonably believe that he is actually free to leave the scene.

*Kemp*, 961 A.2d at 1253 (internal citations and quotations omitted).

- 14 -

prolonged detention to determine whether that person has a license to carry a firearm is illegal, unless supported by something more than the mere possession of a firearm. In **Malloy**, this Court examined **Hicks**. Malloy was a passenger in a car that did not display a license plate. After a police officer initiated a traffic stop, he asked Malloy for identification and if he had a firearm. When Malloy responded that he had a firearm, the officer asked Malloy to exit the vehicle so he could secure the firearm for his safety before continuing with the investigation. **See Malloy**, 257 A.3d at 145-146. The officer then "proceeded to run checks" on Malloy "over the next 15 to 20 minutes" to determine whether Malloy had a license to carry a firearm. **Id.** at 146. We opined:

> [Police] secured [Malloy's] firearm without incident before requesting that [Malloy] produce documentation that the firearm was lawfully in his possession. [Police] seizure of the firearm essentially eliminated any immediate risk the weapon posed to law enforcement personnel [and] bystanders, [] for the duration of the stop and transformed the officer's pursuit of [Malloy's] firearms credentials into an inquiry exclusively aimed at collecting evidence of collateral wrongdoing. Put differently, once [police] secured the firearm, [Malloy's] legal authority to own or possess a gun clearly bore no discernible relationship to individual safety or security within the context of the traffic stop. Under these circumstances, where seizure of a firearm has substantially diminished the risk to officers and others who may be present during a lawful [] detention, we see no reason why the Fourth Amendment, in the absence of independent justification, suspicion, or cause, should tolerate even a 10- to 15-minute extension of a routine traffic stop for the investigation of a secondary criminal matter. Hence, the request challenged in this case does not fall within the category of actions the police may undertake during a lawful traffic stop based solely on concerns for safety and security and without independent justification or cause.

- 15 -

We have rejected [the officer's] investigation into [Malloy's] authority to carry a firearm as an inquiry incidental to the traffic stop and we have excluded [the officer's investigative] efforts as a permissible precaution the police may take during a lawful traffic stop without independent cause.

*Malloy*, 257 A.3d at 153 (internal citation omitted).

More specifically, in *Malloy*, this Court concluded:

[The police] did not investigate [Malloy's] firearms licensure status because he was a passenger in a lawfully stopped vehicle; instead, [the police] commenced the challenged detention and investigation when [the officer] learned that [Malloy] was carrying a firearm. Contrary to the trial court's conclusion that [the police officer] was "in the midst of" a lawful investigative detention when [the officer] asked for [Malloy's] firearms credentials, [Malloy's] removal from the vehicle, [] was not "investigative" in nature but permitted, without cause, as a precautionary measure to ensure safety during a valid vehicle stop. Hence, the relevant, antecedent investigative detention of [Malloy] (and the one challenged in the context of this appeal) is the detention which commenced when [the officer] restrained [Malloy's] liberty to ascertain his authority to carry a firearm. This conclusion aligns with the rationale advanced in *Hicks*, which deemed any encounter undertaken to investigate an individual's firearms licensure status as a request for information that a citizen cannot ignore and, as such, an investigative detention governed by the Fourth Amendment. *See Hicks*, 208 A.3d at 927-928.

\* \* \*

[The police officer] commenced an investigative detention when he asked for documentation establishing [Malloy's] right to carry a firearm. At that time, the only information within [the officer's] possession was that [Malloy] had a firearm holstered on his right hip. Under *Hicks*, that information was insufficient as a matter of law to establish reasonable suspicion.

*Id.* at 155 (footnote omitted).

- 16 -

Here, upon review of the record, the testimony shows that there was a legitimate, valid stop for failing to use a sidewalk. A minor argument about whether there was a sidewalk available ensued before the officers became aware that Appellant was in possession of a firearm. Thereafter, police inquired about dangerous items in Appellant's possession. Appellant immediately responded that he had a firearm in his possession and consented to a search of his backpack. The police secured the firearm and detained Appellant to determine if he had a valid license to carry it.

Accordingly, we initially conclude that the trial court's conclusion that "[Appellant] and Cook were arguing with the officers and [Appellant] was known to be in possession of a gun" is flawed for two reasons. *See* Trial Court Opinion, 2/3/2022, at *12. First, the trial court's factual determination misrepresents the timing of the officers' knowledge of the firearm, as they did not suspect that Appellant was carrying a firearm until Appellant volunteered the information and the minor dispute about the reason for the stop had already concluded. Even the officer said that the earlier confrontation was so minor that he would have returned the firearm to Appellant if he had a valid permit to carry it. Second, the frisk for weapons was not based upon a reasonable suspicion that Appellant was armed and dangerous when Appellant consented to the search. *Compare Commonwealth v. Cunningham*, 287 A.3d 1 (Pa. Super. 2022) (wherein police had reasonable suspicion to frisk Cunningham where there was an odor of marijuana and Cunningham and his associate assumed aggressive postures towards the officers, including efforts

to evade detention and enforcement of the officers). As such, the initial confrontation with police in this matter did not factor into the officers' decision to investigate further into whether Appellant had a valid permit to carry a firearm.

Additionally, once the police secured Appellant's firearm, they "essentially eliminated any immediate risk the weapon posed[.]" *Malloy*, 257 A.3d at 153. At this point, the information within the police officers' knowledge was limited to the fact that Appellant had a firearm, they were in a high crime area, and there was a minor dispute about the sidewalk. Thus, there simply was no justification to continue to detain Appellant to determine whether Appellant had a firearm license. The officers' pursuit of Appellant's firearms credentials transformed into an inquiry exclusively aimed at collecting evidence of collateral wrongdoing. *See id.* Moreover, the police could not "infer criminal activity merely from [Appellant's] possession of a concealed firearm in public." *Hicks*, 208 A.3d at 936. Absent independent justification, suspicion or cause, the police were not permitted to extend a valid pedestrian stop to undertake the investigation of a secondary criminal matter. *See Malloy*, 257 A.3d at 153. Both *Hicks* and *Malloy* hold that detaining a citizen to conduct a search for a firearm license is an investigative detention that requires reasonable suspicion. No evidence presented at the suppression hearing reasonably supported the inference that Appellant's possession of a firearm constituted a violation of criminal law. *Hicks*, 208 A.3d at 937 ("Unless a police officer has prior knowledge that a specific individual is not permitted

to carry a concealed firearm, and absent articulable facts supporting reasonable suspicion that a firearm is being used or intended to be used in a criminal manner, there simply is no justification for the conclusion that the mere possession of a firearm, where it lawfully may be carried, is alone suggestive of criminal activity.").

Upon further review of the record, there appears to be no evidence that the police had prior information that Appellant was not permitted to carry a firearm, as Officer Glenn admitted that he searched computer databases in order to investigate Appellant's licensure status. **See** N.T., 9/1/2020, at 26; **compare Commonwealth v. Walton**, 2022 WL 4100765, at *6 (Pa. Super. 2022) (unpublished memorandum) (upon discovery of a firearm during a protective frisk Walton immediately and spontaneously admitted that he had a felony conviction which disqualified him from possessing a firearm, giving the police articulable facts which supported a reasonable suspicion that Walton's possession of the firearm was unlawful thereby justifying continued detention for further inquiry); **Commonwealth v. Smith**, 2022 WL 16704701, *3 (Pa. Super. 2022) (holding that, because the officer testified that he observed features of the firearm indicating that it was a "ghost gun," its "incriminating nature . . . was immediately apparent"). Moreover, in this matter, Appellant did not evade the police, act nervous, display furtive movements, or volunteer information suggesting that he was not permitted to carry a firearm. **See** N.T., 9/1/2020, at 37-38 (Officer Glenn testified that aside from witnessing Appellant walking in the middle of the street, he did not

observe any other criminal activity); *compare Commonwealth v. Townsend*, 2021 WL 1761041 *1, *5 and *10 (Pa. Super. 2021) (unpublished memorandum) (explaining that the appellant "kick[ed] the firearm under the driver's seat" and provided the officer with reasonable suspicion that he was engaging in criminal activity, thereby justifying the investigative detention). In fact, in this case, Appellant gave the police his identification, volunteered that he had a firearm, and allowed them to retrieve it from his backpack without incident. Finally, while there was testimony that the pedestrian stop occurred in a high crime area at night and that the officers were on patrol in the general area, the officers admitted that they were not called to the area in response to an ongoing criminal investigation. *See* N.T., 9/1/2020, at 8-16; *see Commonwealth v. Anderson*, 276 A.3d 282, 295 (Pa. Super. 2022) (explaining that a defendant's presence "in a high crime area" is a "factor that may be considered in determining whether a police officer possess reasonable suspicion" but is only a "single factor" and not dispositive). Thus, for all the foregoing reasons, we reject the trial court's suggestion that there was reasonable suspicion that criminal activity was afoot specifically related to the recovered firearm based upon the location in a high-crime area at night and/or initial protestation from Appellant and Cook regarding the reason for the pedestrian stop.

Taken all together, Appellant's mere possession of a firearm, without more, was simply not enough to establish reasonable suspicion to continue to detain Appellant further. When the officers began to investigate whether

Appellant was licensed to carry a firearm, they commenced an investigative detention, separate and apart from the initial stop. At that moment, however, the only information within Officer Glenn's knowledge was that Appellant possessed a gun. Thus, this investigation was undertaken without information which suggested that Appellant's possession of a firearm was unlawful; hence, the investigation was initiated without the requisite reasonable suspicion required under **Hicks**. Such action was a violation of Appellant's constitutional rights and, therefore, the evidence obtained as a result of the investigation should have been excluded at Appellant's trial.[6] **See Hicks**, **supra**. Accordingly, we vacate the trial court's order and remand this matter for further proceedings.

Order denying suppression reversed. Judgment of sentence vacated. Case remanded. Jurisdiction relinquished.

Judge Lazarus joins.

Judge Bowes files a Dissenting Memorandum.

---

[6] Our disposition of the suppression issues raised in the context of this appeal focuses exclusively on whether law enforcement personnel complied with constitutional requirements in performing search and seizure functions. Our focus is on the propriety of the officers' conduct, with an eye toward whether evidence obtained by the police may later be introduced at a criminal proceeding against Appellant. Here, as discussed at length, we have determined that the recovered firearm and licensure report must be suppressed and, therefore, the Commonwealth may not present such evidence at a subsequent trial. Our resolution of suppression issues, however, offers no opinion about who holds a superior possessory interest in items seized from suspects by the police. Obviously, firearms that are lawfully possessed or owned may be returned, but matters of police policy do not generally fall within the scope of appellate review of suppression rulings.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date:  11/01/2023